IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**ROBERTO RAMOS MUNOZ**,
    Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

Civil No. 22-1492 (BJM)

**OPINION & ORDER**

    Roberto Ramos Munoz ("Ramos") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Ramos contends that the administrative law judge ("ALJ") erred by (1) improperly dismissing a psychiatric report as inconsistent with other evidence and (2) failing to consider his anxiety, depression, and manipulative limitations when determining his residual functional capacity ("RFC"). Docket No. ("Dkt.") 9. The Commissioner opposed. Dkt. 11. This case is before me by consent of the parties. Dkts. 4-6. For the reasons set forth below, the Commissioner's decision is **AFFIRMED.**

**APPLICABLE LEGAL STANDARDS**

    After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters

entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination

of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1 (the "Listings"), which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz*, 890 F.2d at 524. Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

# BACKGROUND

### A. Medical History

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript. Because Ramos's claim covers the period between February and June 2018, Tr. 24, I focus on medical records from that period.

*Treating Sources*

### Dr. Hector A. Vargas Soto

There are progress notes from November 6, 2015 to November 6, 2019, but they are illegible. Tr. 367, 375, 378, 380, 391. Dr. Vargas also wrote medical certifications stating Ramos had surgery on January 8, 2014 and, as a result, could not work for various periods during 2015 through 2017. Tr. 372, 376, 379, 390, 395.

### Dr. Ibzan Perez Munoz

Dr. Perez is a family medicine doctor who began treating Ramos in September 2014. However, Ramos only visited Dr. Perez once during the relevant period for his application. I note that, on January 22, 2018, Dr. Perez stated Ramos spends his days with his mother and barely goes out. Tr. 91. He also found Ramos barely sleeps and has anxiety and frustration. *Id.* Further, he observed Ramos's speech was coherent and relevant. *Id.* Lastly, Dr. Perez observed Ramos presented as serious, a little angry, and sad. *Id.*

On March 23, 2018, during Ramos's only visit within his eligibility period, Dr. Perez noted Ramos was impatient, especially when talking to representatives from his insurance company. Tr. 90. He wrote that Ramos only leaves home to medical appointments, barely sleeps, and does no leisure activities. *Id.* However, Dr. Perez found Ramos's speech was coherent and relevant while his demeanor was serious and a little annoyed. Tr. 90.

**Dr. Carlos E. Guevara Muñoz ("Dr. Guevara")**

Dr. Guevara began treating Ramos in April 2015. Progress notes extend through March 2019, past the relevant period. Tr. 210.

On January 23, 2018, Ramos visited Dr. Guevara to refill prescriptions. Dr. Guevara noted Ramos suffered chronic pain resulting from his surgery. Tr. 550. Ramos appeared oriented and alert, active, and in no acute distress. *Id.*. He had normal judgment and insight, intact recent and remote memory, and appropriate mood and affect. Tr. 552. Further, he was oriented to time, place, and person. *Id.* However, Ramos experienced a limitation of activity in his musculoskeletal system and pain without cause. Tr. 550. Upon examination, Dr. Guevara found Ramos's spine, ribs, pelvis, and upper and lower extremities were normal. Tr. 552.

On February 22, 2018, Ramos visited Dr. Guevara mainly complaining that he had heartburn when he ate. Tr. 554. During the appointment, Ramos appeared oriented and alert, active and in no acute distress. *Id.* He had normal judgment and insight. Tr. 556. His recent and remote memory was intact, he had an appropriate mood and affect, and he was oriented to time, place, and person. *Id.* Dr. Guevara noted that Ramos had heartburn and excessive flatulence but was otherwise normal. Tr. 554. And Dr. Guevara again found Ramos's spine, ribs, pelvis, and upper and lower extremities were normal. Tr. 556.

On March 22, 2018, Ramos's chief complaint was a cough and sore throat. Tr. 204. Ramos appeared oriented and alert, active, and in no acute distress. Tr. 205. Further, he had normal judgment and insight, his recent and remote memory were intact, and he had an appropriate mood and affect. Tr. 207. He was additionally oriented to time, place, and person. *Id.* However, Dr. Guevara noted Ramos experienced a limitation of activity in his musculoskeletal system and pain

without cause. Tr. 205. Nevertheless, Dr. Guevara again found Ramos's spine, ribs, pelvis, and upper and lower extremities were normal. Tr. 207–08.

Ramos visited Dr. Guevara on April 24, 2018 to refill prescriptions. Tr. 198. Then, he appeared oriented and alert, active and in no acute distress. *Id.* at 199. He again had normal judgment and insight, intact recent and remote memory, and appropriate mood and affect. Tr. 201. Further, he was oriented to time, place, and person. *Id.* Again, Dr. Guevara found Ramos's spine, ribs, pelvis, and upper and lower extremities were normal. Tr. 201–02.

On May 24, 2018, Ramos visited Dr. Guevara complaining of back pain that radiated to his legs. Tr. 192. However, Dr. Guevara found Ramos's spine, ribs, pelvis, and upper and lower extremities were normal. Tr. 195–96. And Dr. Guevara noted that Ramos has chronic pain syndrome, Tr. 196, but did not give any prescriptions or referrals, Tr. 197. He also found Ramos was oriented and alert, active, and in no acute distress. Tr. 193. And he found Ramos had normal judgment and insight, intact recent and remote memory, and appropriate mood and affect. Tr. 195. Finally, Dr. Guevara observed Ramos was oriented to time, place, and person. *Id.*

On June 26, 2018, Ramos visited Dr. Guevara reporting back pain. Tr. 186. At the time, Ramos appeared oriented and alert, active, and in no acute distress. Tr. 187. He again had normal judgment and insight, intact recent and remote memory, and an appropriate mood and affect. Tr. 189. And Ramos was again oriented to time, place, and person. *Id.* Further, Dr. Guevara's examination of Ramos's back found his spine, ribs, pelvis, and upper and lower extremities were normal. Tr. 189–90. However, he again noted that Ramos had chronic pain syndrome, Tr. 190, but did not give any prescriptions or referrals. Tr. 191.

On July 24, 2018, Ramos complained of severe back pain, anxiety, and nervousness. Tr. 180. However, Dr. Guevara found him to be oriented, alert, active, and in no acute distress. *Id.* Dr

Guevara also observed Ramos had normal judgment and insight, intact recent and remote memory, and an appropriate mood and affect. Tr. 574. He was further oriented to time, place, and person. *Id.* And Dr. Guevara's examination of Ramos's back again yielded normal results for his spine, ribs, pelvis, and upper and lower extremities. *Id.* Accordingly, Dr. Guevara did not give any prescriptions or referrals. Tr. 575.

On August 21, 2018, Ramos visited Dr. Guevara for back and hip pain. Tr. 174. Dr. Guevara noted that Ramos had "pain due to internal orthopedic prosthetic devices, implants and grafts." *Id.* at 178. Otherwise, his findings were identical to those of his July examination. Tr. 576–79.

**Dr. Luis Pio Sanchez-Caso (Orthopedic-Spine surgeon)**

Progress notes are illegible. Tr. 236–268; 1126.

**APS Clinics of Puerto Rico**

Progress notes range from November 6, 2018 through September 25, 2019. Tr. 269–294, 303–317, 514–27. These are past the relevant period. On November 6, 2018, Ramos reported anxiety, irritability, and sadness due to severe pain in his body. Tr. 290. He was prescribed Zoloft. *Id.* At the appointment, Ramos had appropriate hygiene and clothing; was calm, cooperative, and friendly; and was oriented as to time, place, person, and situation. Tr. 291–92. Further, his immediate, recent, and remote memory was intact; he could concentrate adequately; and his judgment and insight were good. Tr. 290. In September 2019, he was diagnosed with anxiety, Tr. 515, but no physical conditions. Tr. 523. He further appeared calm, with a normal mood, appropriate affect, and a logical and coherent thought process. Tr. 524.

**Advanced Digital Image Corp.**

After his December 2016 lumbar spine surgery, Ramos underwent an MRI on January 25, 2017. Tr. 368. The procedure showed he had anterior spondylolisthesis, a displacement of a vertebrae in which the bone slides out of its proper position onto the bone below it, in his L5. *Id.* There were also mild degenerative endplate changes and mild bilateral neuroforamina narrowing in his L4-L5. *Id.* And his L4-L5 and L5-S1 had disc desiccation which is consistent with degenerative disc disease. *Id.* Lastly, his L5-S1 had mild to moderate neuroforamina narrowing. *Id.* at 368.

On the same day, he also had a CT scan of the lumbar spine. It reflected the same findings as the MRI and found there was no gross hardware failure. Tr. 370.

A lumbar spine MRI without contrast was done on May 20, 2019. Tr. 1215. When compared to the January 2017 MRI, no significant changes were observed. *Id.* The May 2019 MRI showed multilevel lumbar spondylosis without high-grade thecal sac compression or neural foraminal narrowing. *Id.*

**Centro Radiologico ProSalud**

On March 12, 2019, Ramos had imaging done of the lumbosacral spine and pelvis and postsurgical changes were noted. Tr. 363. One of the screws was fractured and another had its head projecting minimally dorsal and inferior to the body of the screw. *Id.*

**Dr. Yamil C. Rivera Colon**

On May 2, 2019, Dr. Rivera noted that Ramos had a history of lumbar fusion and that the screws of the surgery were loose. Tr. 361. He noted that Ramos was a candidate for surgery, *id.*, which he ultimately performed in August 2019. Tr. 1199–1200.

**Dr. Luis Umpierre, Psy. D**

On August 5, 2019, Dr. Umpierre evaluated Ramos's medical records at the initial level and found there was insufficient evidence to evaluate Ramos's claim. Tr. 739, 741-42.

**Dr. Wanda Machado, Psy. D.**

On November 12, 2019, Dr. Machado evaluated Ramos's medical records at the reconsideration level and affirmed Dr. Umpierre's assessment. Tr. 759.

**B. Procedural History**

Ramos filed an application for disability benefits on June 5, 2019 claiming an onset date of February 9, 2018. Tr. 839. On January 19, 2021, Ramos appeared at a hearing before an ALJ. Tr. 37. He testified he previously worked as a truck driver for the United States Coast Guard from 2001 to 2012, when he was injured on the job. Tr. 44. He subsequently worked at a Coast Guard gas station, although he stated he was technically still employed as a driver during this period. *Id*. Before his injury, Ramos spent approximately four hours driving and four hours loading and unloading his truck. Tr. 45. While doing so, he would lift boxes weighing up to 50 pounds. *Id*. However, Ramos stated that, as of the Summer of 2019, he could stand and walk for just 15 minutes before needing to rest or change positions. *Id*. He further said he could not lift more than 10 or 15 pounds. Tr. 46. This, he explained, was due to pain that persisted even after a back surgery in 2014 and a subsequent operation in 2019. *Id*.

Ramos received therapy and took medication following both back surgeries. Tr. 46–47. However, this apparently did not alleviate his back pain. Ramos testified that, in 2018, he took 20mg of Atorvastatin, 40mg of Prilosec, 100mg of Zartan occasionally, an unspecified diuretic, 50mg of Metoprolol, an unspecified amount of Ambien which was later changed to another medication, Cymbalta, Klonopin, 300 mg of Neurontin, an unspecified amount of Percocet, and

half a tablet of Trazadone. Tr. 47–48. None of these medications caused him any side effects. Tr. 48. Ramos also stated he has diabetes for which he took insulin twice a day. Tr. 49. Further, he said he had depression and anxiety for which he took medication and had appointments every two months with a psychologist. Tr. 50.

On a normal day, Ramos stated he wakes up, takes his medications, drives to his mom's house, watches tv with her, and eats breakfast that she prepares. Tr. 50–51. Ramos stated he cannot bathe by himself and needs help putting on shoes and socks. Tr. 51. After breakfast, he tries to walk for at least 10 minutes, Tr. 50, but uses a cane to do so based on his doctor's recommendation. Tr. 58. Most of the time, he either watches TV and alternates between lying down and standing up. Tr. 52. At his own house, Ramos's sister helps him with laundry and cleans when she can. Tr. 52. Others help him clean the patio and trim vegetation. *Id.* Ramos's sister also helps him grocery shop by accompanying him to stores and care for his dog by bathing him and taking him to veterinary appointments. Tr. 53. Ramos further stated he only socializes with him mom and his sister. Tr. 54.

As for his symptoms, Ramos testified he experiences lower back pain and has a pinched nerve leading to pain in his fingers, feet, and toes. Tr. 54. Because these conditions did not improve with his first surgery, he remained in therapy. *Id.* However, by the end of his surgery and therapy, Ramos stated he was in more pain that before he began. *Id.* Around April 2017, Ramos sought treatment from another doctor, Yamil Rivera, who recommended another surgery. Tr. 55. However, because Dr. Rivera stated Ramos needed to lower his blood sugar levels before surgery, the operation was not performed until August 2019. Tr. 56.

A VE, Joey Kilpatrick, then testified. He stated Ramos was previously employed as a truck driver (DOT 904.383-010), and a cashier II (DOT 211.462-010). Tr. 60. The ALJ asked the VE whether Ramos could perform either job given his age, education, and work experience and his

ability to do the following: lift, carry, push, and pull ten pounds occasionally and less than ten frequently; sit for six hours in an eight-hour shift and stand or walk for two hours, provided he alternates positions for three minutes every 30 minutes; walk long distances using a cane; climb ramps and stairs occasionally; never use ladders, ropes, and scaffolds; frequently balance; occasionally stoop, kneel, and crouch, but never crawl; never work at unprotected heights; occasionally work with moving mechanical parts and operating a motor vehicle; occasionally work in extreme cold and vibration; and accommodate any time off task with normal breaks. Tr. 60. The VE replied that a person with these limitations could not perform Ramos's prior work. *Id.* However, the VE found Ramos could work as a telephone order clerk for food and beverages (DOT 209.567-014), a lens inserter (DOT 713.687-026), and a fishing reel assembler (DOT 732.684-062).

The ALJ then asked the VE to consider someone with the same physical limitations discussed above who could carry out simple and routine tasks and follow, remember, and carry out instructions. Tr. 61. The VE responded that, while such a person could not perform Ramos's past work, he could perform the same alternative occupations already discussed. *Id.*

Finally, Ramos's attorney inquired whether someone could perform the VE's alternative jobs if they needed to take a five-minute break every 30 minutes to stretch and the VE responded that they could not. *Id.*

The ALJ announced her decision on June 29, 2021. Tr. 22–32. She found Ramos had not engaged in substantial gainful activity between the alleged onset date, February 9, 2018, and his date last insured, June 30, 2018. Tr. 24. Further, the ALJ found Ramos's lumbar spine disorder constituted a severe impairment. *Id.*

The ALJ then considered the paragraph B criteria, finding Ramos had mild limitations in all four of the paragraph B functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. Tr. 26. The ALJ noted Ramos never mentioned problems remembering, understanding, or applying information in his function reports. *Id.* Further, she observed that Ramos managed to take his medications by organizing them and writing down reminders. *Id.* Additionally, she found Ramos could manage money independently, drive alone, and follow instructions. *Id.* The ALJ observed the record contained just one incomplete psychiatric progress report that failed to address Ramos's memory and understanding. *Id.* However, she observed that her findings were in line with progress notes by Ramos's primary care physician. *Id.*

As for interacting with others, the ALJ noted Ramos's statements in his function reports that he had no problems socializing. *Id.* Though she acknowledged Ramos's statement that he did not participate in social activities, she noted he spent time with his mother and cousin daily. *Id.* Though the psychiatric progress note states Ramos appeared serious and angry, the ALJ noted it did not state he was uncooperative or exhibited other behavior issues. *Id.* Lastly, the ALJ found notes from Ramos's primary physician and the APS Clinics stated he had normal judgment and calm, cooperative, and friendly behavior. *Id.*

Regarding concentrating, persisting, and maintaining pace, the ALJ noted Ramos stated he could not concentrate due to his pain. Tr. 27. However, the ALJ found the limited psychiatric evidence documented no concentration issues. *Id.* Further, the ALJ observed that Ramos's primary physician documented no complaints regarding concentration and the APS clinics notes documented normal mental health, including appropriate concentration, intact memory, and no signs of attention disorder. Tr. 27.

Lastly, the ALJ found Ramos stated his problems performing personal care and daily activities were due to his physical, not mental, condition. *Id.* Further, she noted Ramos drove, went out independently, prepared simple meals, handled his money, and took care of his shopping needs. *Id.* Additionally, the ALJ observed the psychiatric evaluation mentioned no problems regarding these tasks; Ramos's primary physician described him as alert and oriented with normal judgment and insight; and the APS Clinics reports stated he had appropriate attire and hygiene, was calm, cooperative, and friendly, and demonstrated normal impulse control, good judgment, and adequate insight. *Id.*

Proceeding to Step Three, the ALJ found Ramos did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 27. In support of this determination, the ALJ noted that she had considered Listing 1.15, but that Ramos's conditions did not satisfy the required criteria. Tr. 27–28. Specifically, the ALJ found no evidence of compromise of a nerve root (a requirement for this Listing), muscle weakness, sensory changes, or decreased deep tendon reflexes. Tr. 28. Additionally, the ALJ found physical exams during the pertinent period did not show positive straight leg-raising tests, another requirement to meet this Listing. *Id.* Lastly, the ALJ noted Ramos failed to demonstrate he had at least one of the following conditions required to meet Listing 1.15:

> A documented medical need for walking assistive devices; inability to use one upper extremity to independently initiate, sustain and complete work-related activities involving fine and gross movements and a documented medical need for a one-handed hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or an inability to use both upper extremities to the extent described in this section.

*Id.*

The ALJ then determined Ramos's RFC before proceeding to Step 4. She concluded Ramos could lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently.

Tr. 28. Further, he could sit for six hours in an eight-hour workday and stand and/or walk for two hours in an eight-hour workday with the option of sitting for three minutes after every 30 minutes and the ability to use of a cane to ambulate long distances. *Id.* Additionally, Ramos could never climb ladders, ropes, or scaffolds, but occasionally climb ramps and stairs; balance frequently, stoop occasionally, kneel occasionally, crouch occasionally, and never crawl; never work at unprotected heights; and occasionally work around moving mechanical parts and occasionally operate a motor vehicle. *Id.* Finally, the ALJ found Ramos could tolerate occasional exposure to extreme cold and vibration and his time off-task could be accommodated by normal breaks. *Id.*

In determining Ramos's RFC, the ALJ noted Ramos stated he stopped working because of a status/post lumbar surgery, diabetes mellitus, bilateral lumbar radiculopathy, diabetic polyneuropathy, anxiety, depression, and lumbar stenosis. Tr. 29. The ALJ observed that Ramos reported his lumbar impairment, which required two surgeries, was the most limiting. *Id.* She further noted that, on appeal, Ramos alleged he also suffered from high blood pressure, palpitations, high cholesterol, difficulty sleeping, anxiety, tiredness, and memory problems. *Id.* After recounting Ramos's testimony, summarized above, the ALJ found his medical documentation did not support his alleged limitations. *Id.*

The ALJ began her review of the record with Dr. Guevara's progress notes. *Id.* Those, the ALJ wrote, show that Ramos visited Dr. Guevara monthly, but only complained of low back pain in May and June 2018. *Id.* Further, the ALJ found Dr. Guevara's physical examinations of Ramos led to normal results. *Id.* And though Ramos alleged he could not do housework or cook full meals alone, the ALJ noted he could cook full meals, take medications with reminders, shop for clothes and groceries, manage money, drive his car, and travel alone on public transportation. Tr. 29–30. The ALJ next found Dr. Guevara consistently described Ramos as oriented, alert, active, and in no

acute distress. *Id.* She observed Ramos's neurological examinations were intact while examinations of his back and bilateral upper and lower extremities were normal. *Id.* The ALJ noted Dr. Guevara described Ramos's gait as smooth with an upright posture and that the psychiatric assessment showed normal judgment and insight, intact memory, and appropriate mood and affect. Tr. 30.

The ALJ next examined a March 15, 2018 letter from orthopedic surgeon, Dr. Yamil C. Rivera Colon. The ALJ found that letter stated Ramos was a candidate for surgery, but needed to get his blood sugar under control before any operation. *Id.* Though this supported Ramos's explanation for why he did not get surgery earlier, the ALJ found no other evidence addressing Ramos's lumbar spine during the period relevant to his disability claim. *Id.* Further, the ALJ found a May 2019 lumbar MRI showed no significant interval changes compared to a January 2017 MRI. *Id.* However, the more recent MRI showed Ramos was status/post posterior fusion at L4-S1. *Id.* It also showed evidence of small fluid collection in the laminectomy bed, likely a postoperative seroma, multilevel spondylosis without high-grade thecal sac compression or neural foramina narrowing, and grade 1 anterolisthesis (minimal vertebral displacement) of L5 over S1, which was stable with bilateral L5 spondylolysis. *Id.* Finally, the ALJ found preservation of Ramos's normal lordosis, and that his paraspinal and paravertebral soft tissues were grossly unremarkable. *Id.*

Thus, though the ALJ agreed Ramos had a severe lumbar impairment, she observed that most of the evidence for his condition came from prior to his alleged onset date, which was previously adjudicated, or following his date last insured. *Id.* And the only evidence the ALJ found from the period at issue here showed normal mental and physical examinations as well as the ability to adequately complete most activities of daily living. *Id.* The ALJ noted the state agency medical consultants found insufficient evidence to address Ramos's impairments, but she was

unpersuaded because she found sufficient records to establish Ramos had a severe impairment and determined the RFC was reasonable given Ramos's unremarkable examination results, vague complaints, and ability to perform activities of daily living. *Id.*

After finding Ramos could not perform his previous work as a tractor trailer truck driver, the ALJ then proceeded to Step Five. Tr. 30–31. There, she found that, as of the date last insured Ramos was 45 years-old and thus defined as a younger individual. Tr. 31. Further, he had at least a high school education. *Id.* Given Ramos's background and RFC, the ALJ adopted the VE's finding that, though Ramos could not perform his past relevant work as a tractor trailer truck driver, he could work as a telephone order clerk, lens inserter, or fishing reel assembler. Tr. 31–32.

The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Ramos raises four issues with the ALJ's analysis. He argues the ALJ wrongly disregarded Dr. Ibzan Perez's conclusion that he suffered from a major depressive disorder. Dkt. 9 at 20–21. Then, Ramos contends the ALJ failed to address the following when determining his RFC: (1) his anxiety and depression, *id.* at 15–16; (2) the paragraph B criteria, *id.* at 16; and (3) his manipulative abilities given evidence of his diabetic polyneuropathy. *Id.* at 16–17. The Commissioner responds that Dr. Ibzan Perez's reports are not a medical opinions as relevant regulations define that term and notes some were not completed during the period relevant to Ramos's claim. Dkt. 11 at 6–7. As for Ramos's RFC arguments, the Commissioner contends the ALJ properly addressed Ramos's anxiety and depression, along with the paragraph B criteria, at Step Two and incorporated her findings in the RFC determination. *Id.* at 3–6. Lastly, the Commissioner contends Ramos failed to cite evidence supporting his claim of manipulative limitations. *Id.* at 7–9. I address each issue in turn.

### I.     Dr. Ibzan Perez's Report

Ramos highlights Dr. Perez's medical reports from January, March, and July 2018 along with one from October 7, 2019. Dkt. 9 at 20–21. As the Commissioner noted, the October 2019 report documents Ramos's status more than a year after his eligibility period lapsed in June 2018. *See* Tr. 684–92. Accordingly, it may not be considered. *See Glacken v. Berryhill*, 382 F. Supp. 3d 116, 123 (D. Mass. 2019) (finding ALJ appropriately discounted mental health evaluation where "opinion was rendered almost one year after [claimant]'s date last insured and did not address the seriousness of his mental condition during the relevant time period") (citing *Deblois v. Sec'y of Health & Human Servs.*, 686 F.2d 76, 80 (1st Cir. 1982)).

As for the 2018 reports, in January, Dr. Perez noted Ramos was coherent, relevant, serious, a little angry, and sad. Tr. 91. In March, he observed Ramos was coherent, relevant, serious, and a little annoyed. Tr. 90. Dr. Perez further wrote that Ramos reported hearing voices and feeling watched, but denied seeing shadows and denied having ideas about death or getting hurt. *Id.* And in July, one month after Ramos's eligibility period closed, Dr. Perez found Ramos coherent and relevant, but forgetful, frustrated, and annoyed. Tr. 89. At that time, Ramos reported extreme fear, a lack of desire to do anything, and nightmares. *Id.* The ALJ considered the reports from the relevant period during her analysis of the paragraph B criteria. Tr. 26–27. Though Ramos argues the reports warranted finding more extensive limitations, Dkt. 9 at 20, that argument essentially asks this court to reweigh the evidence. However, this court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán*, 819 F.2d at 3. While Dr. Perez's treatment notes may have supported more substantial limitations, their largely mild findings support the ALJ's

conclusion that Ramos experienced mild limitations in the paragraph B criteria. Thus, the ALJ's evaluation Dr. Perez's treatment notes does not warrant remand.

## II.     Ramos's RFC

Ramos argues the ALJ inadequately evaluated his RFC because she failed to (1) account for limitations resulting from his anxiety and depression; (2) discuss the paragraph B criteria; and (3) address the manipulative limitations resulting from his diabetic polyneuropathy. Dkt. 9 at 15–17. I address each argument.

### A. Anxiety and Depression

Ramos argues the ALJ failed to discuss his anxiety and depression when determining his RFC. Dkt. 9 at 15–16. That is incorrect. The ALJ mentioned his allegations of anxiety and depression. Tr. 29. But she noted "the psychiatric assessment demonstrated normal judgment and insight, intact memory (recent and remote), and appropriate mood and affect." Tr. 30. The ALJ appears to have lifted these findings directly from Dr. Guevara's notes, discussed above. *See* Tr. 189, 193, 195, 199, 207, 552, 556. Accordingly, I find the ALJ appropriately considered Ramos's anxiety and depression when determining his RFC.

### B. Paragraph B criteria

Ramos argues the ALJ failed to address the paragraph B criteria when determining his RFC. Dkt. 9 at 15–16. However, the ALJ evaluated the paragraph B criteria at Step Two and explained that she incorporated this analysis when forming his RFC. Tr. 26–27. Though Ramos acknowledges this, he contends the ALJ's generic language stating she incorporated the paragraph B criteria in the RFC determination is insufficient. Dkt. 9 at 16. However, the ALJ also discussed Ramos's mental condition in her evaluation of his RFC. *See* Tr. 29–30. And this court, along with others, have previously found that such "discussion and incorporation by reference [of the

paragraph B criteria] is sufficient to satisfy the requirement that the ALJ consider all of the Plaintiff's impairments in formulating the RFC." *See Robles v. Comm'r of Soc. Sec.*, 2021 WL 3553788, at *4 (D.P.R. Aug. 11, 2021) (citing *D.C. v. Comm'r of Soc. Sec.*, 2021 WL 1851830, at *5 (D.N.J. May 10, 2021)). "This is especially true when, as in this case, the mental impairment found at step two was not severe but mild." *Id.* (citing *Holley v. Commissioner*, 590 F. App'x 167, 169 (3rd Cir. 2014)). Thus, the ALJ's evaluation of the paragraph B criteria was sufficient and does not warrant remand.

### C. Manipulative Limitations

Lastly, Ramos alleges the ALJ failed to account for manipulative limitations stemming from his diabetic polyneuropathy. Dkt. 9 at 16–17. Though the Commissioner argues a diagnosis alone is insufficient to establish a severe limitation, Dkt. 11 at 8 (citing *Mateo Rivera v. Comm'r of Soc. Sec.*, 2020 WL 7786920, at *6 (D.P.R. Dec. 30, 2020)), "a finding of non-severity does not relieve an ALJ of his obligation to consider a non-severe impairment's impact on a claimant's overall medical condition." *Sacilowski v. Saul*, 959 F.3d 431, 440 (1st Cir. 2020).

Still, Ramos "had the burden of establishing the extent of [his] limitations, which the ALJ then used to determine her RFC." *Mosconas v. Saul*, 2020 WL 6255298, at *1 (1st Cir. Sept. 15, 2020). He argues he met that burden through his testimony. Dkt. 9 at 16–17. However, the ALJ found that testimony unsupported by the medical evidence. Tr. 29. And Ramos "does not point to any opinion . . . that conflicts with the ALJ's RFC finding and would support [his] burden of proof." *Kellilea F. v. Kijakazi*, 2022 WL 2128625, at *8 (D.R.I. June 14, 2022). Accordingly, Ramos's assertion the ALJ erred by failing to include manipulative limitations in his RFC does not warrant remand.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision **AFFIRMED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 19th day of March 2024.

                                                  **S/** *Bruce J. McGiverin*
                                                  BRUCE J. McGIVERIN
                                                  United States Magistrate Judge